PATRICK McGOVERN and CHARLES L. PERRIN, Respondents,
*v.* THE CITY OF NEW YORK, Appellant.

First Department, July 11, 1918.

Municipal corporations — city of New York — action upon contract
    for construction of portion of rapid transit route — partial
    defense — liability of city not limited by amount for which
    issuance of bonds has been authorized — provisions of Rapid
    Transit Act and Greater New York charter construed.

In an action by an assignee of a contractor with the city of New York to
    recover on a contract for the construction of a portion of a rapid transit
    route made with the defendant through the Public Service Commission
    it was alleged in substance as a partial defense that the liability of the
    city on the contract was limited to the amount for which the board of
    estimate and apportionment had authorized the issuance of bonds. Pro-
    visions of the contract, the Rapid Transit Act and the Greater New
    York charter examined, and *held*, that under the rule by which a demurrer
    to a defense may be defeated for the insufficiency of the complaint which
    is invoked by the defendant, the complaint is good, for the defendant
    cannot take advantage of its own wrong in failing to make the necessary
    appropriation authorized by the statute.

While the Legislature contemplated that the board of estimate and appor-
    tionment should prescribe a limit with respect to the amount of bonds
    to be issued at the same time it expressly enjoined upon said board the
    duty before authorizing a contract to prescribe a limitation that would
    be sufficient to meet the requirements of the contract. Hence the
    liability of the city is not limited by the limit prescribed by the board
    of estimate and apportionment with respect to the bonds.

Section 149 of the Greater New York charter, providing among other things
    that no contract wholly payable out of the general fund shall be binding
    or of force unless the comptroller indorse thereon his certificate that
    there remains unexpended and unapplied a balance of appropriation of
    funds applicable thereto sufficient to pay the estimated expense of
    executing the contract, does not apply to a contract entered into pursuant
    to the provisions of the Rapid Transit Act.

APPEAL by the defendant, The City of New York, from
an order of the Supreme Court, made at the New York Special
Term and entered in the office of the clerk of the county
of New York on the 7th day of January, 1918, sustaining
the demurrer to the fourth defense in the second amended
answer.

*William A. Walling* of counsel [*Terence Farley* with him on the brief; *William P. Burr, Corporation Counsel*], for the appellant.

*Thomas F. Conway* of counsel [*Thomas E. O'Brien* with him on the brief], for the respondents.

LAUGHLIN, J.:

The ground of the demurrer is that the defense is insufficient in law. The plaintiffs, on allegations contained in six separate counts, on an assignment from Patrick McGovern, seek to recover the sum of $284,920.84, together with interest, on a contract made by him with the defendant through the Public Service Commission for the First District on the 13th day of February, 1912.

The defense to which the demurrer was interposed is, in substance, that the liability of the city on the contract was limited to the amount for which the board of estimate and apportionment had authorized the issuance of bonds, and that the amount so authorized, with the exception of the sum of $51,400.56, has already been paid. The defense is pleaded as a complete defense, which manifestly it is not; but that point, although referred to, is not taken by the learned counsel for the respondents, and both parties apparently are desirous of having the case decided as if the defense were pleaded as a partial defense. It being a matter of public importance, we deem it proper to express our views on the sufficiency of the defense so regarded.

On the 12th day of May, 1905, the board of rapid transit railroad commissioners of the city of New York, pursuant to authority conferred by chapter 4 of the Laws of 1891 and of the acts amendatory thereof and supplementary thereto, duly adopted a rapid transit route to be constructed, which as modified became known as the Lexington Avenue route, or route No. 5, extending from Battery Park to East One Hundred and Fifty-seventh street, in the city of New York. The Public Service Commission, the successor of said board (Laws of 1907, chap. 429), thereafter caused plans and specifications for the construction of the railroad to be prepared, thereby subdividing the work into sixteen sections, with a

view to advertising for proposals on each section separately, and caused contracts to be prepared in blank for execution by the successful bidders and the Commission. The proposed contracts contemplated that the construction work on each section should not be let for a gross sum, but wholly on a unit basis, and the bidders were required to submit proposals specifying the price per cubic yard of earth excavation and likewise specify the unit price with respect to about 100 items of work without any guaranty as to the quantities and with merely a statement based on an estimate by the engineer with respect to the quantities of the various classes of work, which were expressly stated to be approximate only and not binding on the city. The contracts thus required obliged the contractors not only to perform the work on the sections awarded to them of the character specified on the unit basis but to complete the construction of the entire railroad, with the exception of " the station finish work," and the ballasting and providing and laying the ties and rails on that part of the railroad embraced in the particular section as soon as practicable, and in any event within forty months; and also to do any other work ordered by the engineer, even though not specified in the contract or indicated by the plans, and if such work should not be subject to classification under the specified units, then the contractor was to do the same for the cost price plus ten per cent, and the Commission reserved the right, during the progress of the work, to amplify the plans and to add explanatory specifications and to furnish additional specifications and drawings, and to change the location, and to alter, in whole or in part, in any way deemed necessary for the public interest, the drawings without relieving the contractor from performance at the unit price specified, or cost plus ten per cent if not specified. These reservations and modifications were expressly authorized by the statute. (Rapid Transit Act, § 6, subd. 2, as amd. by Laws of 1909, chap. 498; Id. § 38, added by Laws of 1894, chap. 752, as amd. by Laws of 1909, chap. 498;* Id. § 26, subd. 3, as renumbered from § 34, added by Laws of 1894, chap. 752, and amd. by Laws of 1909, chap. 498.) Proposals were invited

---

* Since amd. by Laws of 1912, chap. 226.— [Rep.

First Department, July, 1918.      [Vol. 185.

on this basis separately for section 9, consisting of a four-track subway extending from East Sixty-seventh street under Lexington avenue to East Seventy-ninth street, with two stations, and with the express approval of the board of estimate and apportionment, which is recited in the contract, the contract was duly awarded to the assignor of the plaintiffs by the Commission, and it was also approved as to form by the corporation counsel.

The learned counsel for the city state in their points that the contract was awarded to McGovern "for $1,961,997," which is quite inaccurate and with respect to a very material point, as I view the case. I find no provision of the contract indicating that it was awarded for a gross sum, and fail to find these figures therein in any form. I infer from the resolution of the board of estimate and apportionment that on the *estimated* quantities of the different work and the price bid therefor by the plaintiffs' assignor, if there had been no error in the estimates and no extra work required, the figures specified would have constituted the contract price of the work; but there was no agreement on the part of the city to pay the contractor that precise amount, and no agreement on his part to do the work for that amount. By the terms of the contract payments were to be made on monthly estimates according to the engineer's estimates of the amount and value of the work done, but fifteen per cent of the amount so certified by the engineer was to be deducted as security for performance until the amount so withheld aggregated $225,000, and thereafter ten per cent of the monthly estimates was to be deducted. The contractor was at liberty to make a cash deposit instead of giving a bond as security for performance; and by the terms of the contract it was expressly stated that he was not entitled to the return of the cash deposit or to the percentages so deducted from the monthly estimates until the engineer and Commission certified that all the work to be done had been fully completed. I emphasize this, for to my mind it has a very material bearing on the question of law presented, since if the contention of the corporation should prevail, the contractor might be obliged to forfeit the amount of the percentages deducted monthly and would be without redress for any work

performed after the bond limit authorized by the board of estimate and apportionment was exhausted.

In the first count plaintiffs allege that from the time the contract was made until the 18th day of August, 1915, they were continuously engaged in the performance of the work and that at the last named date the work was fully completed, with the exception of minor matters; that the engineer of the Commission made forty-two certificates estimating the amount due the contractor for work performed on the unit basis, aggregating $2,277,096.05, the last estimate having been made on the 15th of January, 1916, and also made eight estimates and certificates in writing of work done and materials furnished by plaintiffs which could not be classified according to the unit basis, in the aggregate amounting to $38,943.73; that in order to protect and safeguard buildings adjacent to the subway and the subway itself, it became and was necessary to do a large amount of underpinning of buildings less than seven stories in height, and plaintiffs did the work, " in many cases having been ordered to do so by the Public Service Commission and its engineers," and that all of such work done by them was necessary and the major part was required in carrying out the original plans called for by the contract, and the balance was required by changes made in the original plans calling for additional and different work; that the unit price of such work prescribed by the contract was $82 per lineal foot, and that plaintiffs were obliged to underpin 1,824.71 lineal feet, the contract price of which was $149,626.22, and that the engineer wrongfully and unreasonably neglected and refused to make any estimate for this work, and that such refusal was in violation of the contract and owing to an erroneous construction thereof, and the Public Service Commission also declined to allow or to pay or to certify to the board of estimate and apportionment any amounts due plaintiffs for the underpinning; that a detailed statement of the amount claimed for that item was duly delivered to and left with the Public Service Commission and the finance department of the city prior to the commencement of the action; that on the 18th day of August, 1915, plaintiffs had substantially completed the contract and then demanded that defendant obtain a final certificate from the chief engineer

and make final payment under the contract, but defendant disputed plaintiffs' right to the certificate on the ground that a small amount of work remained to be done, and thereafter and on the 25th day of January, 1916, the parties made an arrangement whereby for a good and valuable consideration defendant agreed to and later did pay plaintiffs the greater part of certain retained percentages, and that by the agreement so made the requirement that plaintiffs obtain the final certificate of the engineer was waived with regard to each of the claims made in the complaint, all of which had theretofore been rejected, disallowed and repudiated by the defendant and by the Public Service Commission and its chief engineer, and it was stipulated in said agreement and understood that the plaintiffs must bring suit or take other proceedings to recover on said claim without reference to the final certificate, which defendant asserted would not include or allow such claim, and that more than thirty days prior to the commencement of the action each of the claims sued upon was duly presented to the comptroller for adjustment, and that he neglected and refused to adjust the same.

It is unnecessary to consider in detail the allegations of the various counts of the complaint. Suffice it to say that the second count was for 4,751 cubic yards of tunnel excavation, the unit price of which was $8.25 per yard, which was only allowed as for rock excavation at $4.65 per cubic yard, owing to an erroneous classification thereof; the third is to recover $51,831.74, for extra work and material; the fourth is for the other extra work aggregating $7,313.69; the fifth is for $44,514.39, the extra cost of the work owing to errors in borings made by defendant and exhibited to bidders with respect to the nature of the material, and the sixth is for extra work and material required by the Public Service Commission and its engineers amounting to $64,326.32, but the claim for this item was reduced by the agreement referred to after the alleged substantial completion of the work to $25,000. The defense contains no denial, and, therefore, for the purpose of determining the demurrer, all the facts pleaded in the complaint are deemed admitted. (*Douglass* v. *Phenix Ins. Co.*, 138 N. Y. 209; *Devoe* v. *Lutz*, 133 App. Div. 356.)

The fourth defense sets forth the provision of section 37 of

chapter 4 of the Laws of 1891, as amended, which prescribes the manner in which the fund for rapid transit construction shall be obtained. It is therein provided in subdivision 1, among other things, that the board of estimate and apportionment, or other local authority in the city in which the road is to be constructed having power to make appropriations of moneys to be raised by taxation, shall " from time to time, and as the same shall be necessary, and upon the requisition of said Public Service Commission," direct the comptroller or other chief fiscal officer of the city, and it shall thereupon become his duty, to issue the necessary bonds; and subdivision 2 provides that the amount of bonds authorized to be issued and sold by that section " shall not exceed the limit of amount which shall be prescribed by the board of estimate and apportionment or such other local authority having power to make appropriations of moneys to be raised by taxation; and no contract for the construction of such road or roads shall be made unless and until such board of estimate and apportionment or such other local authority shall have consented thereto and prescribed a limit to the amount of bonds available for the purposes of this section which shall be sufficient to meet the requirements of such contract in addition to all obligations theretofore incurred and to be satisfied from such bond." (See Rapid Transit Act, § 37, subds. 1, 2, added by Laws of 1894, chap. 752, as amd. by Laws of 1909, chap. 498, and Laws of 1911, chap. 888.)* It will be observed that it is the duty of the board of estimate to make a sufficient appropriation for the work and the statute does not declare that the contract shall be void if it fails so to do before it authorizes the contract nor is the payment of any further amount prohibited. It is further alleged in this defense that on the 1st of February, 1912, the board of estimate and apportionment adopted a resolution, which is pleaded in full, the substance of which, however, is that it consented to the making of the contract between McGovern and the city through the Public Service Commission for the construction of said section 9, which is described,

* Since amd. by Laws of 1913, chap. 540; Laws of 1915, chap. 544, and Laws of 1917, chap. 625.— [Rep.

" at a cost not to exceed one million nine hundred and sixty-one thousand nine hundred and ninety-seven dollars ($1,961,997)," and prescribed said amount as the limit to the amount of the proceeds of corporate stock available for the contract and authorized the comptroller to issue corporate stock in that amount for such purpose. The plaintiffs allege, and as already observed it is not denied, that the board of estimate and apportionment unqualifiedly consented to the execution of the contract between McGovern and the city, and that the comptroller indorsed the contract as required by section 45 of the charter (Laws of 1901, chap. 466, as amd. by Laws of 1907, chap. 439) to the effect that funds were available for the contract. Since those allegations stand admitted by this defense the defendant is not entitled to have the defense construed as showing that the consent of the board of estimate and apportionment was limited to the cost stated in the resolution, which, as already observed, would have been the cost according to the *estimated* quantities if there had been no deviation and no extra work or material. This defense also pleads a resolution adopted by the board of estimate and apportionment July 1, 1915, reciting that said amount of $1,961,997, was the estimated cost of the work, and that the Public Service Commission had made a requisition for the further sum of $413,000 to meet the requirements of the contract, and it was, therefore, resolved that the former resolution be amended by adding thereto said additional amount, and authorizing the comptroller to issue corporate stock accordingly. It is then pleaded that by these resolutions the board of estimate and apportionment prescribed a limit of $2,374,997 as the amount of bonds available for this contract work, and never thereafter authorized the issuance of corporate stock therefor in any greater amount, and that the Public Service Commission never made a requisition for a further amount on account of this contract, and that there has been paid on account the sum of $2,323,596.44.

The learned counsel for the city strenuously argues that the liability of the city is limited by the limit prescribed by the board of estimate and apportionment with respect to the bonds. I think not, for there is no question of power here involved. It is not claimed that the constitutional

limitation with respect to raising municipal funds has been reached or that the statute does not authorize the issuance of further corporate stock. The position taken by the city is that notwithstanding the fact that this contract was entered into, not for a gross sum but on a unit basis, and the contractor was obliged to complete it and could not recover any money deposited in lieu of a bond or for the deductions from the monthly estimates until final completion — that the city's liability may end long before completion; and that notwithstanding the fact that it intended to have the subway constructed and reserved the right to make changes and alterations in the contract work and to call upon the contractor to perform extra work and to furnish additional material, merely because the board of estimate and apportionment in the first instance only provided for the issue of bonds for the estimated cost of the work — there can be no recovery in excess of that amount. Such, I think, would be an unreasonable construction of the statute. It will be observed that while the Legislature contemplated that the board of estimate and apportionment should prescribe a limit with respect to the amount of bonds to be issued, at the same time it expressly enjoined upon said board the *duty before authorizing a contract,* to prescribe a limitation that *would be sufficient* to meet the requirements of the contract. It is not to be inferred that the municipal authorities intended or undertook to mislead the contractor. It does not appear that they drew his attention to the fact that they were attempting to modify or change the provisions of the contract by the resolution adopted by the board of estimate and apportionment in limiting the amount of the bonds to be issued. It is evident that the Commission did not so understand or they would not have executed the contract without inserting a provision that the work was only to be done to the extent of the bond issue authorized.

Section 149 of the charter (as amd. by Laws of 1910, chap. 545)* provides, among other things, that no contract wholly payable out of the general fund should

---

* Since amd. by Laws of 1912, chap. 398, and Laws of 1917, chap. 401.
— [REP.

be binding or of force unless the comptroller indorsed thereon his certificate that there remained unexpended and unapplied a balance of appropriation or fund applicable thereto sufficient to pay the estimated expense of executing the contract as certified by the officer making it. The comptroller, evidently erroneously deeming these provisions applicable, indorsed on the contract two days after it was made a certificate to the effect that there remained unexpended and unapplied an appropriation or fund applicable to the contract sufficient to pay the entire *estimated* expense of executing it as shown by a resolution of the Public Service Commission and of the board of estimate and apportionment, viz., $1,961,997. The contract, which had already been executed, could not be affected by this indorsement (*Levy* v. *McClellan,* 196 N. Y. 178); but in any event the indorsement was unauthorized, for section 45 of the charter governs exclusively and expressly provides that the certificate of the comptroller mentioned in section 149 shall not be necessary to make a contract entered into pursuant to the provisions of the Rapid Transit Act, so called, binding on the city, and said section 45 of the charter (as amd. *supra*) provides that upon the execution of a contract made pursuant to chapter 4 of the Laws of 1891, as amended, the Public Service Commission may in their discretion request the board of estimate and apportionment for the authorization of corporate stock either for such amounts from time to time as they shall deem the progress of the work to require " or for the full amount sufficient to pay the entire estimated expense of executing such contract," and in case they ask for the entire amount " the comptroller shall endorse on the contract his certificate that funds are available for the entire contract whenever such stock shall have been authorized to be issued by said board of estimate and apportionment; and in such case such stock may be issued from time to time thereafter in such amounts as may be necessary to meet the requirements of such contract." It is conceded that the requisition of the Commission was for the *entire* amount of the contract but it is claimed that by the resolution of the board of estimate and apportionment the defendant's liability was limited to the *estimated* cost. I am of opinion that these provisions of the charter, which relate directly to the

rapid transit contracts, so called, are to be read with the provisions of subdivision 2 of section 37 of chapter 4 of the Laws of 1891 (as amd. *supra*), with respect to the issuance of bonds, for they seem to clearly contemplate that application for the issuance of stock to meet the amount due on such a contract may be made from time to time during the progress of the work or for the full amount of the *estimated* expenses at one time, and where the requisition is for the entire amount, which means precisely the same as the preceding expressions, " estimated expense," it becomes the duty of the comptroller to indorse on the contract his certificate that funds are available for the entire contract in the language of the statute, " whenever such stock shall have been authorized to be issued by said board," and then the stock may be issued from time to time. It was not intended to authorize a contract for the *entire* work and then to stop work before completion of the contract if the issuance of bonds authorized originally would prove to be insufficient, which would be the necessary result if the contention made by the appellant should prevail. Authority to provide funds exists. If the municipal authorities were acting in good faith they must at that time have intended to provide funds for the entire work embraced in this contract, the execution of which was expressly authorized by the board of estimate and apportionment. On the facts pleaded the plaintiffs have no other remedy. The city, of course, in other parts of this answer, denies, or attempts to deny, the material allegations of the complaint with respect to its liability for the amounts claimed by the plaintiffs. Aside from the point of law presented by the defense, it will require a trial of the issues to determine whether or not the plaintiffs are entitled to recover any amount. If they are, they doubtless have no other remedy. Until the facts are determined in their favor, although the engineer's certificate has been waived, on the allegations of the complaint, the Public Service Commission could not be mandamused to make a requisition on the board of estimate for further funds and the board of estimate and apportionment could not be mandamused to issue further corporate stock. Under the rule by which a demurrer to a defense may be defeated for the insufficiency of the complaint, which is invoked by the

appellant, I am of opinion, therefore, that the complaint is good, for in the circumstances the defendant cannot take advantage of its own wrong in failing to make the necessary appropriation. (*Davidson* v. *Village of White Plains,* 197 N. Y. 266; *Van Dolsen* v. *Board of Education,* 162 id. 446. See, also, *O'Rourke Engineering Const. Co.* v. *City of New York,* 140 App. Div. 498.)

It follows, therefore, that the order should be affirmed, with ten dollars costs and disbursements.

Cʟᴀʀᴋᴇ, P. J., Sᴍɪᴛʜ, Pᴀɢᴇ and Sʜᴇᴀʀɴ, JJ., concurred.

Sʜᴇᴀʀɴ, J. (concurring):

As to the items involving extra work in the first, third, fourth and sixth causes of action, whether performed on the order of the Public Service Commission, or made necessary by its changes of plan, it is quite clear that the city cannot avoid payment merely upon the ground that it has not expressly authorized an issue of bonds or corporate stock in advance of the doing of the work, out of which to pay for such extra work. I base this conclusion mainly upon the ground that, when the board of estimate and apportionment gave its consent to the original McGovern contract, it *consented* to a contract which contemplated and provided for the doing of extra work upon the order of the Public Service Commission and as deemed necessary by the Commission without any limitation upon the amount of such extra work. It would have been entirely competent for the board of estimate to have refused to consent to any construction contract containing an extra work clause, on the ground that the amount of extra work was not limited, but when the board of estimate chose to rely upon the judgment and good faith of the Public Service Commission as to ordering extra work and gave its consent to a contract providing for extra work, it is plain that, whether judged by purely legal principles or by good faith, the city cannot successfully avoid payment for extra work, done on such order of the Public Service Commission, upon the mere ground that the board of estimate has failed to make the necessary appropriation. I considered these provisions of the Rapid Transit Act with care in *People ex rel.*

*Holbrook, Cabot & Rollins* v. *Mitchel* (N. Y. L. J. Aug. 24, 1915), where the question at issue was whether the board of estimate and apportionment in giving its statutory consent to a construction contract and prescribing a limit to the amount of bonds available to meet the requirements of the contracts, has the power to couple with such consent a proviso dictating to the Public Service Commission a change in the terms of the contract. What was there said bears upon the point under consideration and was in part as follows:

" Acting under the provisions of the Rapid Transit Act and after taking the necessary preliminary steps, such as obtaining the constitutional consents, the preparation of the detailed plans and specifications and the holding of a public hearing upon the form of the contract, the commission adopted a form of contract for the construction of section 3. This form of contract was duly advertised for proposals in accordance with the provisions of section 36 of the Rapid Transit Act,* and after a consideration of such proposals was awarded to the relator, which was the lowest bidder. The form of contract was of the unit price type, the work being divided and subdivided into 151 units, covering all the work that could be foreseen, for each of which a separate price was bid. In view of the complications and the uncertainties incidental to constructing rapid transit railroads in city streets, it has been deemed necessary to provide some method for the payment for incidental work that cannot be foreseen. This was provided for in Article XII of the form of contract. This article provided in effect that in case any work or materials were required that were not susceptible of classification under the 151 unit prices, the contractor must do such work and furnish such materials and would be paid therefor at actual cost plus 10 per centum to cover overhead expenses. As an alternative payment provision the chief engineer of the Public Service Commission was empowered to fix a unit price or lump sum price for such work and materials, which, if approved by the commission and accepted in writing by the contractor, would govern instead of the percentage basis of compensation.

* See Laws of 1891, chap. 4, § 36, added by Laws of 1894, chap. 752, as amd. by Laws of 1909, chap. 498. Since amd. by Laws of 1913, chap. 540, and Laws of 1917, chap. 625.— [REP.

This alternative provision has been in all subway construction contracts awarded since early in the year 1913, and there are now outstanding contracts involving an expenditure of over $73,000,000 which contain it. It is not disputed that the clause in question has worked well in practice and that the city has suffered no detriment therefrom.

"Subdivision 2 of section 37 of the Rapid Transit Act,* having to do almost exclusively with the issue of bonds by the city and the method of providing funds for subway construction and equipment, provides that: 'The amount of bonds authorized to be issued and sold by this section shall not exceed the limit of amount which shall be prescribed by the board of estimate and apportionment or such other legal† authority having power to make appropriations of moneys to be raised by taxation, and no contract for the construction of such road or roads shall be made unless and until such board of estimate and apportionment or such other legal† authority shall have consented thereto and prescribed a limit to the amount of bonds available for the purposes of this section, which shall be sufficient to meet the requirements of such contract in addition to all obligations theretofore incurred and to be satisfied from such bonds.' After this contract was duly awarded to the relator as the lowest bidder, it was transmitted by the commission to the board of estimate and apportionment for appropriate action under the provision of section 37, above quoted. The board of estimate and apportionment promptly consented to the contract and prescribed bond limit, but, although the form of article 12 of the contract had been employed to every one's satisfaction since the first contract was awarded, and had been determined upon at the public hearing and had been approved by the corporation counsel, and was a material part of an advertised proposal duly accepted by the Public Service Commission, the board of estimate decided by a vote 9 to 7 to tack on to its consent the following provision: 'Provided, however, that before this consent shall become operative, there shall be excised from the contract the concluding paragraph of

---

* Amd. by Laws of 1909, chap. 498, and Laws of 1911, chap. 888. Since amd. by Laws of 1913, chap. 540, and Laws of 1917, chap. 625.— [Rep.

† Sic. Statute reads "local."— [Rep.

article 12, which permits the substitution of a lump sum price or unit prices for work not originally bid on, in lieu of a determination of cost to the city based on the cost of labor and materials entering into such work, plus 10 per cent, as provided for elsewhere in said article.' As this does not amount to a legal consent, the commission cannot execute the contract, and as the contractor fears that this material change, made after award and in a contract whose terms must be advertised in advance of an award, will at least throw a cloud upon its validity, and as the contract involves an investment of several millions of dollars, the contractor has been forced to appeal to the courts to determine the validity of this belated attempt of the board of estimate and apportionment to exercise control over the details of the subway construction contracts. In the meantime, work upon a vitally important link in a great public improvement affecting the interests of the entire city is at a standstill.

" For answer to the legal question involved we must look to the Rapid Transit Act and see where the responsibility for the form of the construction contracts is lodged. It is difficult to see how any one who is familiar with the history of the Rapid Transit Act and its development can fail to see that the Public Service Commission is the body intended to be charged with responsibility for and authority over the form of the construction contracts. The Rapid Transit Act of 1891, as amended by the Legislature of 1894, contemplated the creation of a board composed of members named in the act to exercise the powers and duties prescribed therein and provided that such board, after obtaining the necessary constitutional consents, should be independent of municipal control, except in one instance, namely, that any contract for construction at municipal expense must, before execution, be approved as to form by the corporation counsel. The act contained a limitation upon expenditures for rapid transit construction, the limitation being, as embodied in chapter 752 of the Laws of 1894, amended by chapter 519 of the Laws of 1895, in substance as follows: ' The amount of bonds authorized to be issued and sold by this section shall not exceed $50,000,000 par value without the consent of the Legislature first had and obtained; provided, however, that

such amount shall be increased by a sum not exceeding five millions of dollars, if the board of rapid transit railroad commissioners shall certify that such increase is made necessary by payments required for any lands, property rights, terms, easements or privileges which shall be acquired by the said city, as hereinafter provided.' This statutory limitation upon expenditures for rapid transit construction was removed by chapter 562 of the Laws of 1904, which enacted a provision word for word the same as the present provision of section 37 of the Rapid Transit Act hereinabove quoted. The purpose of the legislation of 1904 was plainly to transfer from the Legislature to the city authorities the right to fix the limit of rapid transit expenditures, and it was for this purpose that provision was made for the prescribing of a limit of expenditures by the city authorities and for the obtaining of the consent of the city authorities before any construction contract should be entered into. There is no indication anywhere in the act that there was any intention on the part of the Legislature to transfer to the board of estimate and apportionment any of the powers lodged in the rapid transit board, but on the contrary the Legislature indicates a plain intention to shift from the Legislature to the city the responsibility to determine to what extent the city should be committed financially for rapid transit improvement, while at the same time leaving the planning and managing of the work undisturbed in the rapid transit board. An analysis of the entire act and of each provision under which the board of estimate and apportionment is directed or authorized to take action concurrently with the Public Service Commission, or after the commission has acted, will demonstrate that the sole function of the board of estimate and apportionment, with reference to *construction* contracts, is to provide funds to meet the cost of such construction, and that the board has no authority or jurisdiction whatever with regard to the terms and conditions of the contracts. A detailed analysis would too greatly extend this opinion, but it may be noted here that the act (section 6-1) * provides that the commission shall prepare the detailed plans and specifica-

---

[ * Amd. by Laws of 1909, chap. 498, and Laws of 1910, chap. 205.— [Rep.

tions, including such devices and appurtenances as it may deem necessary, and (section 26-2)* that 'such contract for construction shall contain such terms and conditions * * * as said commission shall determine to be best for the public interests.' In the commission, and not in the corporation counsel or in the board of estimate and apportionment, is lodged the power to compel obedience to the provisions of rapid transit contracts and certificates (section 9-1),† and to the commission is intrusted the acquisition of the necessary real estate and rights and easements therein without submission of its action to any board, and coupled with the power to direct the corporation counsel to institute such condemnation proceedings as it may deem necessary. Throughout the act it is apparent in all its important sections that the commission is vested with complete power as the planning and managing board, and that the board of estimate and apportionment, so far as construction contracts are concerned, is the financial board to determine the limit to be set to the city's rapid transit expenditures. In all matters involving the granting of franchises, the determination and establishment of routes and general plans of construction, equipment and method of operation, the board of estimate and apportionment has had, since the Elsberg legislation of 1906, a right of approval and a determining voice, as is natural and proper. In every such case the act uses the word 'approve' in conferring the power upon the city, whereas in section 37 it is only a consent that is required. The words 'approval' and 'consent' are not used in the act as synonymous. The board of estimate and apportionment is given express authority to *approve* 'general plan' and, as the legal authority in charge of streets, to *consent* to the use of particular streets for railroad purposes. The *approval* of general plans of construction involves a determination of the advisability of those general plans, and the board of estimate and apportionment might be well within its rights in insisting that the form and substance of such general plans be

---

* Renumbered from § 34, added by Laws of 1894, chap. 752, and amd. by Laws of 1909, chap. 498. Amd. by Laws of 1912, chap. 226, and Laws of 1917, chap. 625.— [Rep.

† Amd. by Laws of 1909, chap. 498.— [Rep.

made in all respects satisfactory to it before granting its approval. The *approval* referred to in the act is properly construed as an approval both as to terms and conditions, but ' consent ' cannot be distorted into a synonym for ' approval ' both as to ' terms and conditions ' where the ' terms and conditions ' of the contract are, under the terms of the statute (section 37-2), to be fixed by another body. The ' consent ' required from the board of estimate and apportionment is a consent merely to the execution of an agreement committing the city to spend money, a conclusion which is strongly fortified by finding the provision for that ' consent ' part and parcel of a section headed ' issue of bonds ' and dealing almost exclusively with that subject and the provision of money for rapid transit purposes.

" Of course, if the board of estimate chose to refuse to consent to a construction contract because of the presence of an extra work clause, or because the amount of extra work was not limited, it would have the right to do so, because to it belongs the power of authorizing expenditures. But that is not this case. It has consented to all the extra work that the commission deems necessary and without limit, and is merely seeking to control the discretion of the commission in determining which is the more advantageous way of arranging to have it done.

" Moreover, the contention that the board of estimate and apportionment has the authority to alter the terms of the construction contract renders section 38 of the act* nugatory for this section authorizes the Public Service Commission, with the consent of the contractor and its sureties, to change and modify any construction contract and the plans and specifications thereof, with the sole exception that ' no change or modification in the plans and specifications consented to and authorized pursuant to section 5 of this act ' shall be made without the consent of the board of estimate and apportionment. Turning to section 5† to ascertain what plans and specifications must be made with its consent, we find that they

---

* Amd. by Laws of 1909, chap. 498.    Since amd. by Laws of 1912, chap. 226.— [Rep.

† Amd. by Laws of 1909, chap. 498.— [Rep.

are solely the ' general plan of construction ' for any rapid transit railroad proposed by the Public Service Commission in connection with the determination of a route. Where the commission is thus expressly charged with the responsibility of preparing the construction contract, with advertising it, with hearing objections thereto, with changing the terms, after objections raised on public hearing, with awarding the contract, and is in addition authorized at any time, with the consent of the contractor and his sureties, to modify and change the plans and specifications of any construction contract without the consent of the board of estimate and apportionment, it seems utterly unreasonable for the board of estimate and apportionment to claim that it has any jurisdiction or control over the terms of these construction contracts. There must be ultimate responsibility and power committed to some one official body; at any rate there ought to be in any intelligent scheme of handling great public undertakings of this character. That there is such a body and that the control over construction contracts is committed to the commission is demonstrated by the authority given to the commission to alter and amend these contracts at will, with the consent of the contractor, and is entirely in harmony with the scheme of the act, which just as definitely gives final authority to the board of estimate and apportionment in all matters of franchises, general plans for construction, equipment and operation and appropriating money for rapid transit purposes. I hold, therefore, that the board of estimate and apportionment has no authority or right to couple with its consent a proviso whereby it is sought to control the action of the public service commission in regard to the terms and conditions of this construction contract."

With reference, however, to the causes of action involving strictly contract work, which on the basis of unit prices have resulted in exceeding the bond limit prescribed when the board of estimate consented to the original McGovern contract and its amendment, the matter is not so clear. It seems, at first blush, as though holding the city liable for any excess over the appropriation tended to nullify the absolute control over expenditure for rapid transit purposes which the Rapid Transit Act, the charter and the sound principle of " home

rule " all contemplate and require to be maintained. It naturally occurs to one that if the prescribed bond limit may be exceeded on one contract the excess might be so large as to imperil the completion of other sections, if the whole work is to be kept within the appropriation for the work as an entirety; or, else, on the other hand, the city might find itself committed heavily and to an unknown liability, far in excess of its provision made for the undertaking. But the fact remains that the board of estimate deliberately consented to the unit price form of contract and that it knew when it did so that the amount of work was estimated and that, therefore, the gross price was not and could not, in the nature of things, be determined in advance. It was competent for the board of estimate to refuse its consent to this form of contract and stand out for a lump sum measure of liability, just as it could have refused to approve a form of contract authorizing the Public Service Commission to change the plans and require the doing of extra work. It decided in favor of the unit price contract, evidently relying upon the fact that the Public Service Commission had competent engineers who would know whether the contract estimates were measurably accurate. In a great engineering work of this character some variations, due to exigencies that the very best engineers cannot foresee, are inevitable. If the lump sum form of contract were employed, of course the contractor would add to his price a sum calculated to insure against such unforeseen circumstances. Then, if the difficulties did not arise, the city would have paid an excessive price. Recognizing that the city has to pay the cost of the work in any event, it was deemed best to secure the city against paying for contractor's risk. When the work was done within the estimate, the city would gain the saving. That being so, it would not be fair to saddle the cost on the contractor in the event that the estimate was exceeded. This form of contract, thus interpreted, is fair and reasonable to both sides. Neither does it leave the city unprotected, for the responsibility for the honesty and the reasonable accuracy of the contractor's estimates is placed upon the engineers of the Public Service Commission, to whom the management and general control of the great rapid transit enterprise has been committed.

For these reasons, as well as upon the grounds so forcefully presented in the opinion of Mr. Justice LAUGHLIN, I vote to affirm the order appealed from.

SMITH, J., concurred.

Order affirmed, with ten dollars costs and disbursements.